REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 654

September Term, 2014

_____

CYNTHIA LORRAINE ANDERSON

v.

LAURA H.G. O'SULLIVAN, ET AL.
SUBSTITUE TRUSTEES

_____

Eyler, Deborah S.,
Hotten,
Nazarian,

JJ.

_____

Opinion by Nazarian, J.

_____

Filed:  August 27, 2015

Cynthia Lorraine Anderson appeals from an order of foreclosure in the Circuit Court for Prince George's County denying her motion to stay the foreclosure of her house. Ms. Anderson borrowed $501,383.00 from JPMorgan Chase Bank ("JPMorgan") and its trustees, and the debt was memorialized in a promissory note secured by a Deed of Trust. When Ms. Anderson defaulted on her loan payments in August 2009, JPMorgan commenced this action for foreclosure. After the court denied her Motion to Stay the proceedings, the foreclosure sale proceeded, and she appeals.

We agree with the circuit court that her legal theories—which bear significant resemblance to discredited "Redemptionist" and "Vapor Money" theories—are not valid defenses or meritorious arguments, to the extent they were raised. We also disagree that Ms. O'Sullivan lacked standing to foreclose, and we agree with the trustees that the Motion to Stay did not comply with the requirements under Md. Rule 14-211.

## I. BACKGROUND

On November 28, 2008, Ms. Anderson signed a promissory note that memorialized a loan of $501,383.00 secured by a Deed of Trust on her home in Bowie, Maryland. The Deed of Trust listed Cynthia L. Anderson as the borrower, Melinda Clayton as the trustee, and JPMorgan as the beneficiary. The Deed of Trust included one provision relevant to this appeal:

> **20. Substitute Trustee**. Lender, at its option, may from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder by an instrument recorded in the city or county in which this Security Instrument is recorded. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by applicable law.

Ms. Anderson defaulted on the loan on August 1, 2009. Under regulations set forth by the Commissioner of Financial Regulation, JPMorgan entered Ms. Anderson's date of default as August 2, 2009. Ms. Anderson immediately contested the default by sending two letters to JPMorgan dated August 10, 2009, one asking to inspect the original promissory note and the second requesting access to numerous records and answers to nearly thirty questions.[1] JPMorgan appointed substitute trustees under paragraph 20 of the Deed of Trust on October 29, 2012, replacing Melinda Clayton with Laura H.G. O'Sullivan and six other individuals (the "Substitute Trustees").[2]

JPMorgan and the Substitute Trustees (collectively "the Appellees") sent Ms. Anderson a Notice of Intent to Foreclose on September 16, 2013. The Appellees conducted a loss mitigation analysis, but records show that Ms. Anderson elected not to negotiate modification or mitigation with JPMorgan after the analysis was completed on November 20, 2012.[3]

On December 3, 2013, Ms. Anderson requested a "hearing on standing" and filed requests for interrogatories. She submitted another request that the court compel the

---

[1] Ms. Anderson submitted four letters to JPMorgan (dated January 23, 2012, March 3, 2012, March 23, 2012, and April 10, 2012) requesting answers to the same questions and access to the same documents. All appear to have gone unanswered.

[2] The other named Substitute Trustees were Erin M. Brady, Diana C. Theologou, Laura L. Latta, Jonathan Elefant, Laura T. Curry, and Chastity Brown.

[3] This is based purely on JPMorgan's records. There is no independent evidence in the record that Ms. Anderson filed or signed anything to forgo the attempt at mitigation, but she also does not contend otherwise.

Substitute Trustees to answer interrogatories on January 15, 2014. She filed a Motion to Dismiss on May 6, 2014 and a Motion to Stay on May 27, 2014. On June 2, 2014, the court denied the Motion to Stay, ruling that she failed to state a valid defense or present a meritorious argument, file timely, state a factual or legal basis, or provide supporting documents (the "June 2 Order."). In response, Ms. Anderson filed a Motion for an Emergency Hearing the same day.

The Substitute Trustees sold the home to JPMorgan at an auction on June 3, 2014 for $323,400.00, and reported the sale on June 10. Ms. Anderson filed an appeal on June 17, 2014.[4]

## II. DISCUSSION

Ms. Anderson's brief contains a long list of "Questions Presented" for our review.[5] The record is muddy as to whether Ms. Anderson filed a timely appeal and which order

---

[4] In the meantime, Ms. Anderson filed a petition for protection under federal bankruptcy laws, and the United States Bankruptcy Court for the District of Maryland granted an automatic stay in an Order of Relief on May 30, 2014. But the Substitute Trustees filed to vacate the sale in accordance the Bankruptcy Court's Order of Relief, and the Bankruptcy Court dismissed the action August 8, 2014. On October 27, 2014, the circuit court found that Ms. Anderson's bankruptcy was active prior to the foreclosure sale, and vacated the sale (the "October 27 Order."). On October 31, 2014, the court reversed itself, instead submitting a notice of ratification for the sale, subject to Ms. Anderson's submission of evidence showing cause to reverse by December 1, 2014 (the "October 31 Order"). None of these decisions is before us.

[5] The list contained in Ms. Anderson's brief, which we recount *verbatim*, is difficult to decipher:

Accept For Honor Upon Proof Of Claim UCC 3-501, UCC 9-210, UCC 9-203

1) Original wet ink signed promissory note (BOND), Contract without alteration signed by defendant with all allonges/attachments front and back. MD Comm. Law Art § 3-407(a) and (b) MD. Comm. Law Article §3-305(c)

2) Original signed mortgage agreement instrument without alterations signed.

3) Notarized wet ink signature the assignment of mortgage without alteration with all allonges. (Commercial Law Article, §§ 1-202, 3-308, and 3-505), (MD. Comm Law Art. § 3-401(a)—Signature, § 3-402) MD Evidence 5-902Rule

4) Pooling and servicing agreement.

5) Trust prospectus and prospectus supplement.

6) Unbroken chain of transfers and deliveries from the originator to trust or current holder/assignee showing ownership by the assignment/title page with an unbroken chain of transfer of the delivery and acceptance receipt(s) to document the transfer and delivery of the bare note, from the originator to the sponsor along with delivery and acceptance receipt(s) with the bare note, from the sponsor to the depositor along with delivery and acceptance receipt(s), from the depositor to the trust along with the chain of transfers and deliveries and acceptance receipt(s), from the originator to the trust and to the current holder/assignee. Include the name(s) of the document custodian and anyone associated with the document transfer for the trust securitization/foreclosure. MD Comm. Law Art. § 3-603(b), §3-309(b) 3-308.

7) Were Appellants denied Substantive and Procedural Due Process, including but not limited to the denial of the Appellants' Motion to Show Cause, where a judicial process riddled with fraud voids the entire proceeding? MD Rule 2-322

8) Must a Plaintiff prove standing as the real party in interest per MD Rule 2-201 and carry the burden of proving their case with admissible evidence, beyond a naked affidavit in order to commence foreclosure?

9) Must a witness have personal firsthand knowledge to attest to facts under oath and to be deemed a credible witness?

10) Must a court take Judicial Notice of adjudicative facts and act on crimes reported to Judicial Officers?

she was appealing, but because she is representing herself, we have read her papers as flexibly as they permit, and have construed it as an appeal from the denial of her Motion to Stay, *i.e.*, from the June 2 Order.[6]

---

Beyond this list, Ms. Anderson questions the Substitute Trustees' standing to foreclose, and the validity of the loan itself. She argues that the loan is invalid because "there has not been any Valuable Consideration Given," or "attachment of an [*sic*] Security Interest," and the loan cannot be enforced. She further asserts that the State of Maryland and the United States hold interest in her estate, and an attack against her estate is "FRAUD AND TREASON AGAINST THE UNITED STATES." Lastly, she questions whether JPMorgan followed the General Accepted Accounting Principles and whether the original promissory note had been altered. She concludes by asserting that "this is a clear breach of contract and this alleged loan is VOID." All capitalizations here and hereafter appear as they did in Ms. Anderson's brief.

[6] The June 2 Order immediately precedes Ms. Anderson's notice of appeal. It denies Ms. Anderson's Motion to Stay, but may not be intended "finally to dispose of the case." *Id.* Orders from the circuit court containing provisions indicating that the order is not intended to be final are not appealable. *Makovi v. Sherwin-Williams Co.*, 311 Md. 278, 281 (1987). The question is whether, under Md. Rule 14-211, the denial of the motion to stay functions more similarly to a denial of a motion to dismiss or a denial of injunctive relief. The former is not a final judgment, and would not be appealable, whereas the latter is interlocutory and appealable. *See Fishman v. Murphy ex rel. Estate of Urban*, 433 Md. 534, 539-40 (2013). The outcome of this appeal is the same either way, but because we discern that Ms. Anderson would continue to litigate the decisions following denial of a motion to stay, we have construed the order as a denial of injunctive relief and will address her appeal on the merits.

We note as well that while it is metaphysically impossible for Ms. Anderson to have appealed from the court's Orders of October 27 and 31, 2014 on June 17, 2014, these too would not be ripe for appeal if we elected to look past the space-time problem. The October 27 Order is not intended to be final, because it contains a stay order pending the completion of Ms. Anderson's bankruptcy proceedings: "this proceeding be and is hereby automatically stayed pending bankruptcy." This order cannot suffice as "[a] 'final judgment' [which] is a judgment that 'disposes of all claims against all parties and concludes the case.'" *Doe v. Sovereign Grace Ministries, Inc.*, 217 Md. App. 650, 660 (2014) (citation omitted). The October 31 Order, while affirming the foreclosure sale, also is not a final order because it allows Ms. Anderson to dispute the notice by submitting

In order to stay and dismiss a properly initiated foreclosure proceeding, a borrower must "state with particularity the factual and legal basis of each defense that the moving party has to the validity of the lien or the lien instrument or to the right of the plaintiff to foreclose in the pending action." Md. Rule 14-211(a)(3)(B). These defenses must not only be articulated, but documented, *id.*, (a)(3)(C), and, if untimely, the borrower must demonstrate good cause why the motion wasn't filed on time. *Id.*, (a)(3)(F). The court then makes an initial determination on the merits and "shall deny the motion, with or without a hearing, if the court concludes from the record before it that the motion… was not timely filed and does not show good cause for excusing non-compliance with subsection (a)(2) of this Rule," Md. Rule 14-211(b)(1)(A), or "does not on its face state a valid defense to the validity of the lien or the lien instrument or to the right of the plaintiff to foreclose in the pending action. Md. Rule 14-211(b)(1)(C). The June 2 Order found

"cause to the contrary thereof . . . on or before the 1st day of December, 2014." Md. Rule 2-602(a) provides:

> [An] order or other form of decision, however designated, that adjudicates fewer than all the claims in an action . . . or that adjudicates less than an entire claim, or that adjudicates the rights and liabilities of fewer than all the parties to the action:
>
> (1) is not a final judgment;
>
> (2) does not terminate the action as to any of the claims or any of the parties; and
>
> (3) is subject to revision at any time before the entry of a judgment that adjudicates all of the claims by and against all of the parties.

that the Motion to Stay was untimely, that it did not state a valid defense or meritorious argument, and lacked supporting documents. Our independent review of the record and the law confirms that the circuit court ruled correctly.

Ms. Anderson's arguments, which at times are confusing, misconstrue statutes and lack a viable basis in law. She never refers to her legal theories under any particular name, but we recognize them as theories advocated by proponents of the "Redemptionist Movement" and the "Vapor Money Theory." No Maryland court has directly opined on either theory in a reported opinion, but many federal and state courts have,[7] and they have found unanimously, and unequivocally, that neither qualifies as a valid defense to or meritorious argument to foreclosure.

---

[7] *See, e.g.*, *Blocker v. U.S. Nat. Ass'n*, 993 N.E.2d 1154, 1157 (Ind. Ct. App. 2013) (finding that "[b]oth the 'vapor money' and 'redemption' theories have been 'roundly rejected by courts across the nation' (citation omitted.)); *McLaughlin v. CitiMortgage, Inc.*, 726 F.Supp.2d 201, 214 (D. Conn. 2010) (noting that legal arguments based on these two theories alone justify the filing of a Motion to Dismiss, as they have been "universally and emphatically rejected by numerous federal courts for at least the last 25 years"); *Stevenson v. Bank of America*, 359 S.W.3d 466, 468 n.6 (Ky. Ct. App. 2011) (calling the theories "roundly rejected"); *Monroe v. Beard*, 536 F.3d 198, 203 n.4 (3rd Cir. 2008) (considering the "Redemptionist" theory and describing it as a "scheme" that "advocate[es] the exploitation of the UCC filing process"); *United States v. Anderson*, 353 F.3d 490, 509 (6th Cir. 2003) (calling the "Redemption" theory "illustrative of contempt for all authority. Not just judicial authority, but all authority"); *United States v. Dykstra*, 991 F.2d 450, 453 (8th Cir. 1993) (noting that defendant, who acted pursuant to the "Redemption" theory, "acted with the intent to secure an unwarranted financial gain for himself"); *United States v. Hildebrandt*, 961 F.2d 116, 117 (8th Cir. 1992) (convicting a defendant of submitting false statements to a government agency for filing false forms with the IRS as instructed by "Redemptionist" teachings); *United States v. Landers*, 564 F.3d 1217, 1219 (10th Cir. 2009) (calling a "Redemptionist" book titled *Cracking the Code* "anti-government").

**A.** **Neither the "Redemptionist Theory" nor the "Vapor Money Theory" is a viable legal theory.**

The "Redemptionist Theory" calls for proponents to "exploi[t] the UCC filing process" to take advantage of an individual's fictional "strawman" personality. *Monroe v. Beard*, 536 F.3d 198, n.4 (3rd Cir. 2008). *Beard* succinctly summarized the essence of the Redemptionist argument:

> [T]he "Redemptionist" theory … propounds that a person has a split personality: a real person and a fictional person called the "strawman." The "strawman" purportedly came into being when the United States went off the gold standard in 1933, and, instead, pledged the strawman of its citizens as collateral for the country's national debt. Redemptionists claim that [the] government has power only over the strawman and not over the live person, who remains free. Individuals can free themselves by filing UCC financing statements, thereby acquiring an interest in their strawman. Thereafter, the real person can demand that government officials pay enormous sums of money to use the strawman's name.

*Id.* Citing Black's Legal Dictionary as authority, Redemptionists reason that a "strawman" is "one who acts as an agent for another for the purpose of taking title to real property and executing whatever documents and instruments the principal may direct respecting the property. *Person who purchases property for another to conceal identity of real purchaser, or to accomplish some purpose otherwise not allowed*." The American's Bulletin, *Redemption Manual: From Government-Imposed Ignorance To Enlightenment as a Secured Party Investor* 257 (4.5 ed. 2008) (quoting Black's Legal Dictionary (6th ed.) (emphasis in original)). This "legal fiction," therefore, must be "captured," by filing the appropriate UCC financing statements to "secure a claim via a 'superior security interest' against the all capitalized legal fiction/Straw-man, the property and the collateral." *Id.* at

8

258. Only after the appropriate UCC-1 financing statement is filed is the Redemptionist "redeemed." *Id.* Through this redemption the Redemptionist now becomes "the Holder in Due Course" of the property held by the strawman, and can access the "Charge Back Process," which "goes back to the United States Treasury to charge-up what is called your 'UCC CONTRACT TRUST ACCOUNT,'" identified by your/the Debtor/Straw-man's 'Social Security Number' . . . The Charge Back charges up the account for future discharge of debt." *Id.* A clear distinction is made between the real person and the fictional strawman by "writing it in *all capital letters*," so "when your name is written in all capital letters, IT IS NOT YOUR NAME!" *Id.* (Emphasis in original.)

The "Vapor Money Theory," on the other hand, contends that banks essentially lend a borrower their own money when a loan is issued:

> The "vapor money" (or "no money lent") theory posits that Congress has never given banks the authority to extend credit and, thus, banks act beyond their charters when making loans. Proponents claim banks create money "out of thin air," through ledger entries and bookkeeping tricks, by "depositing" a borrower's promissory note without the borrower's permission, listing the note as an "asset" on the bank's ledger entries, and then lending a borrower back his own "money." Since banks do not have enough "real money in their vaults" to cover the sums lent, loans are not backed by actual money— the only real money is gold or silver; paper money is worthless since it is created by an illegitimate Federal Reserve—making them invalid *ab initio* and creating no obligation for repayment.

*Stevenson v. Bank of America*, 359 S.W.3d 466, n.6 (Ky. Ct. App. 2011).

Ms. Anderson's brief seems to reflect, albeit not with clarity, that she subscribes to both theories. She attempts to separate herself (as "Cynthia Lorraine Anderson") from her

strawman (strawperson?) (as "CYNTHIA LORRAINE ANDERSON") by claiming that she is the "General Executor Of this Birth Estate (CYNTHIA LORRAINE ANDERSON)." She claims that the United States has an interest in the estate of her strawman and therefore also bears the financial responsibilities of her mortgage: "[t]he United States is Secure Party creditor of this Estate (CYNTHIA LORRAINE ANDERSON) held in trust." This is the only explanation we can divine for her claims that Ms. O'Sullivan's foreclosure action constitutes an act of treason against the United States and the State of Maryland.[8] She discounts the validity of paper money and the Federal Reserve, and argues for the "Vapor Money Theory" in its entirety, if not by name:

> Financial Institutions, through sleight of hand, creating the appearance of "lending" money, dupe the Men and Women into signing the all important original note (fraud in the inducement), thinking they received a "loan", when in fact they just created a publicly issued debt instrument (30 yr bond) that is discounted (original issue discount) to its present face value (i.e. amount of purported "loan"). Without express or implied consent by the Men or Women, their instrument is then illegally converted (alteration voids the note) by indorsing the note "pay to the order of.. without recourse." … Via the "magic" of fractional reserve "banking" (Financial Institution), that note is hypothecated (pledged to borrow multiple times the face amount), and/or securitized (depending on whether it's a residential or commercial "portfolio" note) and is used by the bank (Financial Institution) or the SPV (special purpose vehicle) or REMIC (real estate mortgage investment conduit) to "fund" further instruments and securities (derivatives) via

---

[8] Ms. Anderson cites many international treaties in her brief, but we see no basis on which we could view the Substitute Trustees' foreclosure action as an act of treason or an act of war against the United States. Furthermore, as Ms. Anderson is a citizen of the United States (regardless of her best efforts to convince us otherwise), we do not see how the Geneva Conventions, the Hague Convention, or any other source of international law could apply here.

10

> false statements to the bondholders on the back end (i.e. AAA
> rated toilet paper sold to investors and pension funds).

We agree with the United States District Court of the District of Connecticut in *McLaughlin* that we must not "lightly ascribe such beliefs to anyone," but we are constrained to conclude that "the only plausible explanation [we] can discern for the arguments in [the appellant's] filings is that they are rooted in this Redemptionist theory." *McLaughlin v. CitiMortgage, Inc.*, 726 F.Supp.2d 201, 210 (D. Conn. 2010).

These contentions have not, will not, and cannot be accepted as valid. Beyond the overwhelming legal precedent rejecting them, government agencies have also condemned these theories. The IRS has opined that "[t]here is no authority under the Internal Revenue Code or any other applicable law that supports the claim that taxpayers may avoid their federal tax obligations based on 'straw man' arguments … or similar arguments. The formatting of a taxpayer's name in all upper-case letters on government documents or elsewhere has no significance whatsoever for federal tax purposes." *Internal Revenue Bulletin April 4, 2005, Rev. Rul. 2005-21*, Internal Revenue Service (last viewed July 10, 2015), http://www.irs.gov/irb/2005-14_IRB/ar13.html#d0e756. The ruling concludes by holding that "[c]laims based on 'straw man' arguments or on similar arguments, to avoid federal tax obligations, are frivolous and have no merit." *Id.* Similarly, the FBI has identified the "Redemption/Strawman/Bond Fraud" scheme that discounts the validity of individuals harking the Redemptionist Theory. *Common Fraud Schemes*, Federal Bureau of Investigation (last viewed July 10, 2015), https://www.fbi.gov/scams-safety/fraud/fraud.

11

Ms. Anderson's contentions do not, therefore, raise a valid defense to the foreclosure proceeding before us. JPMorgan did not loan Ms. Anderson her own money when she signed the Promissory Note, and she alone has the responsibility to repay the money she borrowed. No volume of UCC filings can shift Ms. Anderson's financial burden to her "strawman," and the law recognizes no difference between Cynthia Lorraine Anderson and CYNTHIA LORRAINE ANDERSON. Ms. Anderson cannot dodge her legal and financial responsibilities by claiming herself as "general executor," denying her citizenship,[9] or through any other filings or declarations to these effects.

**B.** **The Substitute Trustees and JPMorgan had standing to foreclose, and Ms. Anderson failed to state her defenses in the Motion to Stay with the particularity required under Md. Rule 14-211(a)(3).**

We similarly reject Ms. Anderson's argument that the Substitute Trustees have no standing to foreclose. The original Deed of Trust unambiguously references the beneficiary and lender as JPMorgan, and contains the provision that "[t]his Security Instrument secures to Lender: … (c) the performance of Borrower's covenants and agreements under this Security Instrument and the Note." This includes the foreclosure procedure, paragraph 18, and the substitute trustee provision in paragraph 20. The original Note lists JPMorgan as the "lender," directly linking the ownership of the Note to the allonge, and the covenants

---

[9] We have no authority or ability to recognize Ms. Anderson's attempt to successfully declare herself independent of the United States (a "sovereign citizen") by publishing a "DECLARATION OF POLITICAL STATUS & ACCEPTANCE OF OFFER PURSUANT TO 12 USC §95a (2) & 12 USC § 411," nor can we recognize or distinguish Ms. Anderson as "a living woman standing on the land without the UNITED STATES."

and provisions of the Deed of Trust. The transfer to the Substitute Trustees adhered with the requirements of paragraph 20. Once the Deed of Trust is legally transferred, "the right to enforce the deed of trust follow[s]." *Deutsche Bank Nat. Trust Co. v. Brock*, 430 Md. 714, 728 (2013) (citing *Svrcek v. Rosenberg*, 203 Md. App. 705, 727 (2012)).

Furthermore, *Deutsche Bank* noted that, as the borrower pays and incrementally discharges her obligations under the note with each payment, it necessarily follows that the party to whom the borrower pays is entitled to enforce the note. *Id.* at 729. There is a distinction between the owner of a note and the holder, but the holder has standing to enforce the note, so we are not required to consider whether the owner has been sufficiently identified in this case. *Id.* Ms. Anderson knew where to send payment on the loan, and to whom she should address the payment, as she successfully made payments until she didn't. Her own exhibit references JPMorgan as the lender on the Deed of Trust and the holder of the Note. JPMorgan, as the holder of the note, legally appointed the Substitute Trustees as trustees, conferring on them the ability to enforce it.

The Substitute Trustees and JPMorgan have also fulfilled their production requirement under Md. Rule 14-207, which lists the documents foreclosing parties must attach to the order to docket:

> (1) a copy of the lien instrument supported by an affidavit that it is a true and accurate copy.
>
> * * *
>
> (2) an affidavit by the secured party, the plaintiff, or the agent or attorney of either that the plaintiff has the right to foreclose and a statement of the debt remaining due and payable;

(3) a copy of any separate note or other debt instrument supported by an affidavit that is a true and accurate copy and certifying ownership of the debt instrument;

(4) a copy of any assignment of the lien instrument for purposes of foreclosure or deed of appointment of a substitute trustee supported by an affidavit that it is a true and accurate copy of the assignment or deed of appointment;

(5) with respect to any defendant who is an individual, an affidavit in compliance with § 521 of the Servicemembers Civil Relief Act, 50 U.S.C. app. § 501 et seq.;

(6) a statement as to whether the property is residential property and, if so, statements in boldface type as to whether (A) the property is owner-occupied residential property, if known, and (B) a final loss mitigation affidavit is attached;

(7) if the property is residential property that is not owner-occupied residential property and the lien instrument being foreclosed is a mortgage or deed of trust, a final loss mitigation affidavit to that effect. [10]

In addition, documentation is required for the applicable housing programs, pre-file mediation if the borrower elects to participate, and a statement if the borrower does not

---

[10] Rule 14-207(b). JPMorgan and the Substitute Trustees provided copies of both the Note and the Deed of Trust, along with affidavits from Jonathon W. Hudgins, the Vice President of JPMorgan, who certified ownership over the Note and that the copy of the Note submitted is a true and accurate copy, and Jonathan Elefant, substitute trustee, who certified that the Servicemembers Civil Relief Act requirements were met and that the lien instrument submitted is a true and accurate copy of the Deed of Trust. The Intent to Foreclose along with required program information (including for MDHope.org) were mailed to Ms. Anderson. Documentation of the Substitute Trustees' appointments was signed by Ernesia Hutchinson, Vice President of JPMorgan, along with an affidavit from Mr. Elefant certifying the Deed of Appointment, Affidavit of Ownership, and Affidavit of Debt and Right to Foreclose. Elvis Vargas, Vice President of JPMorgan, certified that Ms. Anderson opted out of mediation alternatives and submitted a Preliminary Loss Mitigation Affidavit. The Final Loss Mitigation Affidavit, signed by Mr. Vargas, was also attached.

elect to participate. Rule 14-207(b)(1)-(10). The record contains all of the required paperwork, and it was attached and served along with the Order to Docket in this case.

We agree as well that Ms. Anderson failed to comply with the requirements under Md. Rule 14-211. Again, the Rule imposes specific documentation requirements for Motions to Stay:

> (B) state with particularity the factual and legal basis of each defense that the moving party has to the validity of the lien or the lien instrument or to the right of the plaintiff to foreclose in the pending action;
>
> (C) be accompanied by any supporting documents or other material in the possession or control of the moving party and any request for the discovery of any specific supporting documents in the possession or control of the plaintiff or the secured party.

Md. Rule 14-211(a)(3). There is also a time requirement for filing the Motion:

> (A) Owner-Occupied Residential Property. In an action to foreclose a lien on owner-occupied residential property, a motion by a borrower to stay the sale and dismiss the action shall be filed no later than 15 days after the last to occur of:
>
> (i) the date the final loss mitigation affidavit is filed.

Md. Rule 14-211(a)(2).

Ms. Anderson complied with none of these provisions. She sent numerous letters to both JPMorgan and the court, but none complied with Rule 14-211. For example, Ms. Anderson's January 15, 2014 "Defendant Request For Scheduled Hearing To Compel Plaintiff To Anwser [*sic*] Interrogatories" comprised only a discovery request, and her "Notice of Withdrawal, Redeposit, and Equitable Power and Authority Granted" submitted on March 4 prayed only vaguely for equitable relief. Ms. O'Sullivan filed a Final Loss

15

Mitigation Affidavit on February 26, 2014, which started the 15-day period under Rule 14-211(a)(2)(A)(i). But Ms. Anderson did not reply with a Motion to Dismiss until May 6, 2014, nearly two months after the 15-day time limit expired. The Motion to Stay was submitted even later, on May 27, 2014. To be sure, "a court may extend the time for filing the motion or excuse non-compliance for good cause shown," but "'ignorance of the law is no excuse,'" *Svrcek*, 203 Md. App. at 721 (quoting *Hi Caliber Auto and Towing, Inc. v. Rockwood Cas. Ins. Co.*, 149 Md. App. 504, 508 (2003)), and Ms. Anderson has offered no reason for failing to meet the time requirement.

Although we do not need to consider the contents of Ms. Anderson's Motion to Dismiss or Motion to Stay, we note that neither would have been sufficient. The May 6, 2014 Motion to Dismiss includes only a lengthy statement of law with no analytical reasoning, or direct application to the facts of this case, and a discovery request. It does not "state with particularity the factual and legal basis of each defense"; and it does not list coherently the defenses Ms. Anderson claims. Likewise, the May 27, 2014 Motion to Stay added a list of questions augmenting her arguments, but her legal analysis consists of a list of quotes, many with no logical basis or precedential value in this court. We agree with the trial court that the Motion failed to "state a valid defense or present meritorious argument," was "not timely filed," "[f]ail[ed] to state factual and legal basis," and contained "[n]o supporting documents."

> **JUDGMENT OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**

16